***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to re-hear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, reverses the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-trial Agreement and at the hearing as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter of this claim.
2. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. All parties are properly designated, and there is no question as to misjoinder or nonjoinder of parties.
4. An employer-employee relationship existed at all relevant times to this action, between Alcoa, Inc. (hereinafter referred to as Defendant) and Plaintiff.
5. At all relevant times to this action, Defendant is and was self-insured, for the purposes of meeting the requirements of the Workers' Compensation Act of the State of North Carolina, with the Specialty Risk Services as its servicing agent.
6. At the time of Plaintiff's injury, his average weekly wage was $998.81, resulting in a weekly compensation rate of $665.87.
7. The parties stipulated to the following documentary evidence at the hearing before the Deputy Commissioner:
 a. Stipulated Exhibit Number One (1) — North Carolina Industrial Commission forms;
 b. Stipulated Exhibit Number Two (2) — Medical records from:
 i. NorthEast Orthopedics, P.A.;
 ii. Stanley Memorial Hospital Outpatient Rehabilitation Center; *Page 3 
 iii. Perry Barron Orthopaedics Sports Medicine;
 iv. Orthopaedic Specialists of the Carolinas, P.A.;
 c. Stipulated Exhibit Number Three (3) — Plaintiff's Motion to Compel Defendants to Pay for Medical Treatment Pursuant to N.C. Gen. Stat. § 97-25;
 d. Stipulated Exhibit Number Four (4) — Administrative Order by Keischa M. Lovelace, Special Deputy Commissioner, dated March 2, 2007;
 e. Stipulated Exhibit Number Five (5) — plaintiff's employment application;
 f. Stipulated Exhibit Number Six (6) — Plaintiff's Answers to Defendant's First Set of Interrogatories to Plaintiff;
 g. Stipulated Exhibit Number Seven (7) — Letter from the Employment Security Commission of North Carolina dated July 22, 2006 denying Plaintiff unemployment benefits;
 h. Stipulated Exhibit Number Eight (8) — Appeals Decision from the Employment Security Commission of North Carolina dated September 8, 2006;
 i. Stipulated Exhibit Number Nine (9) — Grievance Report dated September 23, 2006;
 j. Stipulated Exhibit Number 10 — E-mails from Mimi Rawlings dated September 28, 2006;
 l. Stipulated Exhibit Number 11 — Work Notification dated August 16, 2004; *Page 4 
 m. Stipulated Exhibit Number 12 — Defendant's Response to Plaintiff's Motion to Pay for Medical Treatment dated February 12, 2007;
 n. Stipulated Exhibit Number 13 — Pre-trial Order dated May 8, 2007;
 o. Stipulated Exhibit Number 14 — Defendant's Employee Summary Report for Plaintiff.
8. Also at the hearing before the Deputy Commissioner, Defendant entered into evidence Plaintiff's written responses to discovery from another workers' compensation claim, identified as I.C. File No. 348454.
9. After the hearing before the Deputy Commissioner, the parties stipulated to the following documentary evidence:
 a. Medical records from David Simms Ruch, M.D.;
 b. The transcript of the hearing before the Deputy Commissioner.
 *********** MOTION TO ADMIT ADDITIONAL MEDICAL RECORDS INTO EVIDENCEAND MOTION TO COMPEL DEFENDANT TO REIMBURSE PLAINTIFF FORMILEAGE PURSUANT TO N.C. GEN. STAT. § 97-25
In a Motion dated February 5, 2008, Plaintiff requested that the Full Commission admit into evidence certain medical records of treatment Plaintiff received to his left shoulder after Deputy Commissioner Ledford closed the record for this matter. In support of his Motion, Plaintiff states that such new medical records would be relevant to his claim. However, Defendant did not have the benefit of using these new medical records in the presentation of their case, and the record in this matter is now closed. After careful review of both the written and the oral arguments of counsel, Plaintiff's Motion is DENIED. *Page 5 
In a Motion dated February 28, 2008, Plaintiff requested that the Full Commission order Defendant to pay for mileage expenses incurred by Plaintiff for post-surgical appointments with NorthEast Orthopedics, P.A., in light of the fact that Defendant voluntarily agreed to pay for Plaintiff's left shoulder surgery. In light of the instant Opinion and Award entered by the Full Commission, and set forth in more detail below, Plaintiff's Motion is now deemed moot, as the instant Opinion and Award addresses such request by Plaintiff.
 *********** ISSUES
1. Whether Plaintiff's work-related injury by accident of February 17, 2005 aggravated or accelerated his pre-existing left shoulder problems, and if so, whether his on-going left shoulder problems are related to the February 17, 2005 accident?
2. Whether additional medical compensation is due Plaintiff for his injury by accident of February 17, 2005?
3. Whether temporary total disability benefits should be reinstated?
 ***********
Based upon the competent evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 54 years of age, has a high school diploma, and has an Associate's Degree in Business Administration from Montgomery Technical Institute. Plaintiff also holds a diploma for air conditioning and refrigeration repair. Prior to his employment with Defendant, Plaintiff held the following employment positions: three (3) years in the Army, where he counted and distributed automobile parts; approximately one and one-half (1 ½) years as an *Page 6 
upholsterer in a furniture plant; and six and one-half (6 ½) years as a correctional officer in a correctional facility.
2. Plaintiff worked for Defendant at its Badin, North Carolina facility for 18 years in various departments and capacities, including the pot room, the ingot department, the finishing department, the mold line, the shipping department, and the R214 department. The majority of Plaintiff's work at Alcoa was strenuous, continuous, heavy work. In particular, Plaintiff characterized working on the mold line as heavy and strenuous, and working in the R214 department as an "aggressive" job.
3. In 1997, Plaintiff suffered an injury to his left shoulder. Although Plaintiff testified he felt that this injury occurred at work, Plaintiff never filed a workers' compensation claim for any 1997 injury involving his left shoulder. Renda Powell confirmed that Plaintiff never made a workers' compensation claim or reported to Defendant an injury to his left shoulder for this 1997 incident.
4. Beginning in March 1997, Plaintiff sought treatment for this left shoulder injury from Dr. David Simms Ruch at Wake Forest University Medical Center. Dr. Ruch found that Plaintiff suffered a full thickness rotator cuff tear in his left shoulder. On June 26, 1997, Dr. Ruch performed an open left rotator cuff repair and open subacromial decompression on Plaintiff.
5. Plaintiff last saw Dr. Ruch on November 24, 1997, at which time Dr. Ruch found that Plaintiff had 90 degrees of abduction and 30 degrees of forward flexion in his left shoulder. Although Plaintiff's condition improved and Dr. Ruch did not assign a disability rating or work restrictions for Plaintiff's left shoulder, Dr. Ruch did find that Plaintiff had weakness in his anterior deltoid, along with adhesive capsulitis and loss of motion of the left shoulder. *Page 7 
Accordingly, Dr. Ruch advised Plaintiff that an arthroscopic release of his left shoulder would be helpful. Rather than undergo surgery, Plaintiff advised Dr. Ruch that he was going to return to work and see whether he could perform his previous employment activities.
6. After Plaintiff's left shoulder injury in 1997, he eventually returned to work full time as a caster operator at Defendant. In March 1999, while working as a caster operator, Plaintiff suffered a compensable injury to his right shoulder. Plaintiff testified that he received all workers' compensation benefits due for his right shoulder injury, and that that case is closed. Further, Plaintiff does not intend to re-open his claim for his right shoulder injury.
7. After the right shoulder injury, Plaintiff received permanent restrictions for his right shoulder (but not his left shoulder) of no lifting over 20 pounds, no pushing or pulling greater than 10 pounds, and no reaching above shoulder level. When Plaintiff returned to work with these restrictions, Defendant placed him on light duty, and he stayed on light duty with Defendant at all times after his right shoulder injury. Defendant initially assigned Plaintiff to be a crane operator, which is only part of the mold line job. Later, Plaintiff drove a forklift; however, this caused pain and irritation to his shoulder. Eventually, Plaintiff integrated more of the mold line duties into his position, but since he was on light duty he could not do parts of the typical mold line job requirements.
8. From March to July 2003, Plaintiff saw Dr. James R. Skahen, III at NorthEast Orthopedics, P.A. for complaints of bilateral hand pain and numbness. As part of his examination on March 10, 2003, Dr. Skahen examined both of Plaintiff's shoulders and noted that his left shoulder showed a significant loss of range of motion, but significantly, Plaintiff was not actually complaining of left shoulder pain. Dr. Yvonne Sue Nelson and Dr. Michael David Lauffenburger, (both of whom treated Plaintiff for the February 17, 2005 accident which is the *Page 8 
subject of this claim), reviewed Dr. Skahen's records and considered Plaintiff's range of motion in his left shoulder on this March 10, 2003 note to be more impaired than after the February 17, 2005 accident, although they acknowledged that Plaintiff did not complain of pain there at that time.
9. As of February 17, 2005, when he suffered the injury that is the subject of this claim, Plaintiff continued to work in a light duty capacity on the mold line, raking impurities off of molten metal. On February 17, 2005, the crane man that Plaintiff was working with was pouring metal out of a cruise into a 1,500 pound mold. Plaintiff was using a long rake to pull the skimmed metal, which weighed about 25 pounds, when he felt a pop and a sharp pain in his left shoulder as he reached out with the rake. When Plaintiff used his shovel to pick up the skim out of the trough, he had a deep, increasing pain in his shoulder. At the time of injury, Plaintiff was protecting his right shoulder due to his restrictions from the previous compensable work injury.
10. Plaintiff reported the injury by accident to his supervisor, Mr. John David Holt, on the same day it happened. The next day, Plaintiff came into work and spoke to Mr. Holt and Ms. Renda Boger Powell, Defendant's workers' compensation administrator, who sent him to the company physician, where he received a prescription for pain medication and an order to remain out of work indefinitely. Thereafter, Defendant paid medical and temporary total disability benefits to Plaintiff for a number of weeks, pursuant to a Form 60 admission of compensability.
11. On February 22, 2005, Plaintiff went to NorthEast Orthopedics, P.A. for further medical treatment. On this date, Dr. Nelson, who is a board-certified family practitioner who focuses her practice on occupational medicine, first examined Plaintiff. Dr. Nelson noted in her records that Plaintiff had a left rotator cuff injury in 1997, but did not have on-going problems with his left shoulder afterward, and that he had a right shoulder injury in 1999 that required him to utilize his left shoulder *Page 9 
to bear more of the weight at his job. Dr. Nelson examined Plaintiff's left shoulder and found that he had slightly improved pain over the past couple of days, but tenderness in the anterior shoulder joint, limited abduction, and impaired rotator cuff strength. Dr. Nelson diagnosed Plaintiff with tendonitis and a probable rotator cuff tear, gave him some pain and inflammatory medication, referred him to physical therapy, and returned him to work with light duty restrictions. Both Dr. Nelson and Plaintiff agreed that conservative treatment would be the more appropriate course, at this time.
12. At his visit of March 8, 2005, Plaintiff still had limited range of motion and strength in the left shoulder. On March 22, 2005, Dr. Nelson ordered magnetic resonance imaging (M.R.I.) of the left shoulder. The M.R.I., which was without contrast, did not reveal frank evidence of a torn rotator cuff, but rather, tendon inflammatory changes consistent with tendinosis. In April 2005, Dr. Nelson tried a steroid injection of Plaintiff's left shoulder, but this provided only temporary relief of Plaintiff's pain, and the pain became further aggravated by Plaintiff driving a forklift, pursuant to an attempt by Defendant to place Plaintiff in an alternate light duty position.
13. Since conservative treatment was not relieving Plaintiff's pain, Dr. Nelson referred Plaintiff to her partner Dr. George Adam Flowers, orthopaedic surgeon, for a surgical consultation on his shoulder. Dr. Nelson never saw Plaintiff after April 26, 2005.
14. Dr. Flowers initially saw Plaintiff on May 16, 2005. Dr. Flowers is a board-certified orthopedic surgeon, whose subspecialty is arthroscopy and sports medicine. Dr. Flowers deals primarily with upper extremity problems, particularly shoulders. Dr. Flowers' initial evaluation of Plaintiff's left shoulder showed normal muscle tone, no atrophy, and a well-healed incision from the 1997 surgery. Dr. Flowers found that Plaintiff had limited range of *Page 10 
motion and impingement signs in his left shoulder. When Dr. Flowers raised Plaintiff's left arm passively, Plaintiff had a painful response, although there was no tenderness over the collarbone. Dr. Flowers reviewed the March 2005 M.R.I., which he found to demonstrate decreased space under Plaintiff's left shoulder blade and some tendonitis along the supraspinatus tendon. After discussing treatment option, including the relative risks and benefits of continued conservative therapy versus surgery, Plaintiff elected to proceed with conservative therapy, including home exercise, anti-inflammatory medications, and his work restrictions were continued.
15. At Plaintiff's June 16, 2005 visit, Dr. Flowers administered to Plaintiff a steroidal injection in his left shoulder. Dr. Flowers discussed with Plaintiff again the possible benefits of arthroscopic surgical evaluation of his left shoulder, and Plaintiff again declined to have surgery. At his July 14, 2005 visit with Dr. Flowers, Plaintiff reported that he had near complete pain relief from the previous steroid injection, but after approximately two (2) weeks, he felt stiffness in his neck and trapezial region. Dr. Flowers continued Plaintiff's work restrictions of no lifting over five (5) pounds and no lifting overhead, and also continued his current medications.
16. Plaintiff continued to see Dr. Flowers on a monthly basis through November 2005. In addition, Plaintiff continued to refuse to consider surgery as a treatment option. As a result, Dr. Flowers continued him on the same work restrictions, but had no further medical treatment to offer Plaintiff. Without surgery, Dr. Flowers considered Plaintiff to be at maximum medical improvement as of February 13, 2006, and so Dr. Flowers set forth this assessment in a letter of February 13, 2006 to Defendant.
17. On March 13, 2006, Plaintiff saw Dr. Glenn Bradford Perry, an orthopaedist for an independent medical evaluation. Dr. Perry reviewed Plaintiff's history, performed a physical examination, and noted that the M.R.I. of March 2005 showed no evidence of a left rotator cuff *Page 11 
tear. Dr. Perry concluded that Plaintiff had active flexion to 145 degrees, 60 degrees of internal and external rotation, normal strength, positive impingement signs, and no atrophy in his left shoulder. Dr. Flowers diagnosed Plaintiff with persistent left shoulder pain; however, he found that Plaintiff's symptoms did not match the diagnosis of impingement, and so he ordered an M.R.I. arthrogram, with contrast.
18. Plaintiff underwent the M.R.I. arthrogram on March 22, 2006. The radiologist report noted no evidence of a full thickness or significant partial thickness rotator cuff tear, degenerative changes at the glenohumeral joint with prominent inferomedial and anterior humeral spur, as well as degenerative changes at the bony glenoid. However, the radiologist went on to raise the possibility of a "Type II SLAP tear injury" to the labrum, based upon the presence of a small, focal area of contrast along the junction of the labrum in the adjacent articulating cortex, distinct from the sub-labral roof.
19. On March 28, 2006, Dr. Perry interpreted the M.R.I. arthrogram to show some glenohumeral and acromioclavicular degenerative changes, but no recurrent tear in the rotator cuff, and no other abnormalities on the M.R.I. arthrogram. Dr. Perry recommended surgical debridement if Plaintiff's pain became intolerable, but suggested that Plaintiff continue to "live with his pain" if he could. Finally, Dr. Perry released Plaintiff to work with the same restrictions outlined by his treating physician at that time, Dr. Flowers.
20. Dr. Flowers saw Plaintiff again on July 18, 2006, at which time Plaintiff had a painful arc of motion of his left shoulder and tenderness over the left acromio-clavicular joint. He took x-rays, which showed significant bone spurs, degenerative joint disease, and some osteoarthritis. Dr. Flowers administered another steroid injection to Plaintiff's left shoulder, *Page 12 
continued Plaintiff's work restrictions, and released Plaintiff from his care, with the option to return to him on an as-needed basis, since Plaintiff did not want surgery.
21. Although Dr. Flowers did not review the M.R.I. arthrogram ordered by Dr. Perry, he testified that while an M.R.I. without contrast may miss up to 50 percent of labral tears, the M.R.I. arthrogram, which is with contrast, only misses two (2) to five (5) percent of labral tears. Further, even though Dr. Flowers did not diagnose Plaintiff with a labral tear, he did testify that it was possible that an underlying labral tear from the February 17, 2005 work injury could explain Plaintiff's complaints of pain, although he then went on to express some concerns about knowing whether a labral tear was the cause of the work injury, given the timing of the M.R.I. arthrogram a year after the incident. Dr. Flowers also agreed that there was an aggravating event to the underlying, degenerative disease in Plaintiff's left shoulder, based upon the timing of the February 17, 2005 work accident, along with Plaintiff's immediate onset of pain. Finally, Dr. Flowers testified that although he placed Plaintiff at maximum medical improvement on February 13, 2006, he still thought Plaintiff's left shoulder could be improved with surgery, since he still had pain and limited range of motion.
22. On November 28, 2006, in response to a questionnaire from Defendant, Dr. Nelson provided an evaluation of Plaintiff's current condition. Although Dr. Nelson is not an orthopaedic surgeon, never examined Plaintiff after April 26, 2005, or reviewed the M.R.I. arthrogram of his left shoulder performed in March 2006, she formed the opinion that Plaintiff's current left shoulder complaints were predominantly inflammatory in nature, and that his on-going pain was due to a chronic impingement tendinitis rather than an acute injury. Further, Dr. Nelson concluded that Plaintiff had a zero (0) percent permanent partial disability rating as a result of his February 17, 2005 work injury, and that since Plaintiff's on-going left shoulder *Page 13 
complaints were due to his pre-existing, degenerative shoulder disease, his private health insurance should pay for any medical care related to it.
23. In her deposition, Dr. Nelson still agreed with the opinions she previously gave. Although Dr. Nelson conceded that as orthopaedic surgeons who specialize in treating shoulders, Dr. Flowers and Dr. Lauffenburger would be in a better position to discuss the nature of Plaintiff's left shoulder injury, she formed the opinion that any surgery undertaken on Plaintiff's left shoulder may not be necessitated by the work injury, but rather, due to Plaintiff's pre-existing bone spurs, which could be decompressed to reduce Plaintiff's level of pain. Dr. Nelson did testify that she believed the February 17, 2005 incident either aggravated or accelerated Plaintiff's underlying left shoulder condition; however, it was "difficult to say . . . how much of it's pre-existing and how much of it is the pop that he felt" on February 17, 2005, especially since Plaintiff continued to have significant pain without frank evidence of a rotator cuff tear. Further, Dr. Nelson somewhat contradicted her testimony by stating, on the one hand, that Plaintiff's February 17, 2005 work injury may have temporarily aggravated his pre-existing left shoulder condition, but that this aggravation ultimately resolved, but then, on the other hand agreeing that her reason for referring Plaintiff to Dr. Flowers was due to the fact that Plaintiff's complaints following his February 17, 2005 work injury were not resolving.
24. On January 30, 2007, Plaintiff saw Dr. Michael Lauffenburger for a second opinion. Dr. Lauffenburger is a board-certified orthopedic surgeon with a primary specialty of arthroscopic shoulder surgery. Dr. Lauffenburger took a detailed history from Plaintiff, performed a physical examination, and reviewed Plaintiff's prior medical records, as well as the M.R.I. of March 2006. Plaintiff reported to Dr. Lauffenburger that he had mild, on-going symptoms in his left shoulder prior to the February 17, 2005 incident, but that he was still able to *Page 14 
use his left arm well in a physically demanding job, even to the point that he compensated for the right shoulder injury by using the left shoulder much more. With respect to the work accident in question, Plaintiff relayed to Dr. Lauffenburger that on February 17, 2005, he was trying to protect his right shoulder while raking molten metal, and that immediately after reaching out with his rake full of skimmed metal, he felt a pop and a sharp pain in his left shoulder, and then he began feeling severe pain. On examination, Dr. Lauffenburger found that Plaintiff had a limitation in raising his arm overhead, significant pain at extremes of motion, slightly diminished strength, and positive impingement tests.
25. Upon review of the 2006 M.R.I. arthrogram, Dr. Lauffenburger found an intact rotator cuff and degenerative changes with spurring, but also a possible tear of the labrum cartilage (SLAP tear). Dr. Lauffenburger felt that the March 2005 M.R.I. missed the labral tear because it was without contrast, and labral tears can be subtle injuries that are difficult to see without the benefit of contrast in the imaging. Although Dr. Lauffenburger could not be certain that Plaintiff had a labral tear, he did indicate that on physical examination of Plaintiff's left shoulder, provocative tests used to look for injuries such as rotator cuff tears or labral tears were all very positive.
26. As a result of Dr. Lauffenburger's examination of Plaintiff and his review of the March 2006 M.R.I. arthrogram and medical records, Dr. Lauffenburger agreed with the recommendation of arthroscopic surgery, and further stating that if Plaintiff did not have any surgery, that he would retain a 16 percent permanent partial disability rating to his left shoulder, but that if he did have surgery, his impairment rating would improve. Further, Dr. Lauffenburger stated that any physician who has had the opportunity to review the 2006 M.R.I. arthrogram would be in a superior position to judge Plaintiff's current impairment, and that an orthopaedic *Page 15 
surgeon, such as he or Dr. Flowers, would be better qualified than a family/occupational medicine practitioner, such as Dr. Nelson, to give an opinion on both the causation of Plaintiff's left shoulder complaints, as well as the impairment resulting therefrom.
27. With respect to causation, Dr. Lauffenburger opined, to a reasonable degree of medical certainty, and the Full Commission finds as fact, that Plaintiff's February 17, 2005 work injury aggravated and/or accelerated his underlying shoulder disease, and that the mechanism of Plaintiff's injury, as described to him, which is applying force through one's arm and extending it away from the body in an awkward position, is typical for the type of anatomic injury he saw in Plaintiff.
28. Sometime after Plaintiff's left shoulder injury on February 17, 2005, Defendant placed him in the position of driving a forklift. However, Plaintiff stopped this position after complaining that it irritated his left shoulder. Dr. Lauffenburger corroborated Plaintiff's complaints concerning driving the forklift, when he testified that it would be difficult to maneuver a forklift that would require him to extend out his arms and steer at or above shoulder level, especially with restrictions placed on both shoulders. Similarly, when Defendant offered Plaintiff a position as a crane operator, which is not a full-time job, Plaintiff had to stop this job due to the irritation it caused in his left shoulder. With both of these positions, Plaintiff's supervisor agreed that Plaintiff was willing to at least try the jobs to the best of his ability.
29. After attempting the forklift and crane positions, Plaintiff went to work in the lab in the R214 department as a "lab sample shooter," which is only a small part of R214 department duties. In this job, Plaintiff would analyze metal samples from the furnace, testing somewhere between eight (8) to 16 samples per day, which occupied approximately 30 minutes of his shift. *Page 16 
Because Plaintiff was only able to do a fraction of the normal duties of this R214 position as a "lab sample shooter," there would be hours of his shift in which he had nothing to do.
30. Mr. Harold Lee Sturdivant, a long-term employee of Defendant who is the union president, and who observed Plaintiff work as a "lab sample shooter" after he injured his left shoulder, stated that this position was one that Defendant made specially for Plaintiff, since normally, the R214 operators tested their own metal samples, and no employee ever held the position as "lab sample shooter" prior to Plaintiff being assigned to it. Moreover, the R214 operators are currently doing their own testing, and it is only a very small part of their job. Finally, Mr. Sturdivant stated that there were no jobs available at Defendant for a person, like Plaintiff, with restrictions of no lifting over five (5) pounds and no overhead use of the left arm.
31. While Plaintiff worked as a "lab sample shooter," oftentimes during the intervals when Plaintiff had no samples to test, Defendant would have him do odd jobs, like making photocopies. In addition, Defendant offered Plaintiff other jobs on the floor, but Plaintiff was unable to do the jobs because of pain in his left shoulder. Plaintiff remained in the "lab sample shooter" position until Defendant laid him off from his employment in June 2006. The Full Commission finds, based upon the greater weight of the evidence, that the "lab sample shooter" position, which was Plaintiff's last position with Defendant before his termination, was a "make work" position that cannot be found in the normal, competitive job market. Therefore, Plaintiff remained disabled.
32. In June 2006, Defendant reduced its workforce from four (4) crews to three (3) crews, and as a result, Defendant laid off five (5) people, including Plaintiff, from their employment. The lay-off was done pursuant to union seniority rules, and Plaintiff was one of the least senior people in his department. The Full Commission finds, based upon the greater weight of the evidence, that but for Plaintiff's lack *Page 17 
of seniority, he would have retained only a "make work" position with Defendant in the form of the "lab sample shooter" position, since there were no full-time jobs that Plaintiff could perform at Defendant that could be found in the normal, competitive job market.
33. Since Plaintiff's termination, he has not held any other employment, despite several attempts by Plaintiff to find jobs. From June 2006 to May 2007, Plaintiff searched for employment with the United States Postal Service, the North Carolina Department of Corrections, his local A.B.C. store, Kellam Company Biscoe Foundry, Kellam Machine Company, Joseph Banks Clothing Store, a real estate company, the name of which he could not recall, and at a hotel in Pinehurst. However, Plaintiff was unsuccessful in securing employment with any of these prospective employers, for various reasons, including not being able to meet the physical requirements, not having the requisite experience, and because many were not accepting new applications. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff is a credible witness, and that Plaintiff made reasonable efforts, under the circumstances, to find suitable employment following his June 2006 termination.
34. Twice, Plaintiff applied for unemployment benefits; however, the Employment Security Commission of North Carolina determined that the physical restrictions to Plaintiff's right and left shoulders eliminated him from a majority of jobs for which he would otherwise be qualified in the local labor market. In addition, Plaintiff is applying for Social Security disability benefits.
35. The Full Commission finds that greater weight should be given to the testimony of Dr. Lauffenburger, since he is the last physician to have examined Plaintiff, he reviewed the *Page 18 
March 2006 M.R.I. arthrogram, and he is an orthopaedic surgeon who specializes in shoulder arthroscopic surgeries.
36. The greater weight of the evidence shows that Plaintiff suffered a compensable aggravation of his preexisting degenerative left shoulder problems on February 17, 2005. Although Plaintiff had significant pre-existing degenerative disease bilaterally to his shoulders, the degenerative disease in Plaintiff's left shoulder aggravated and/or accelerated his admittedly compensable work injury of February 17, 2005. Further, Plaintiff's February 17, 2005 work injury is ongoing in nature.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff had a compensable injury by accident at work on February 17, 2005 resulting in an injury to his left shoulder. Plaintiff had a pre-existing degenerative condition in his left shoulder that was aggravated and accelerated by his compensable injury by accident. This was not a temporary exacerbation, but a significant aggravation resulting in Plaintiff's current inability to work. Due to this compensable injury by accident, Plaintiff is entitled to ongoing medical care for his left shoulder. N.C. Gen. Stat. §§ 97-2(6); 97-25 (2007).
2. Defendant filed a Form 60 accepting compensability of Plaintiff's injury by accident, and paid Plaintiff temporary total disability benefits pursuant to the Form 60. Defendant's payment of compensation to Plaintiff, pursuant to a Form 60, which stipulated to the compensability of Plaintiff's injury, created a presumption that Plaintiff's additional medical *Page 19 
treatment is directly related to his compensable injury. Perez v.American Airlines, 174 N.C. App. 128, 620 S.E.2d 288 (2006).
3. Since Plaintiff met the burden of proving the causal relationship between the compensable injury and his symptoms, it is the burden of Defendant to prove that the injury was unrelated to the present symptoms. Parson v. Pantry, Inc., 126 N.C. App. 540, 485 S.E.2d 867
(1997). However, Defendant failed to prove that Plaintiff's current disability and symptoms are unrelated to his compensable injury by accident on February 17, 2005.
4. When a pre-existing, non-disabling, non-job related condition is aggravated or accelerated by an accidental injury arising out of and in the course of employment, then the employer must compensate the employee for the entire resulting disability, even though it would not have disabled a normal person to that extent. Morrison v. BurlingtonIndustries, 304 N.C. 1, 18, 282 S.E.2d 458, 470 (1981). When an injury aggravates an existing condition, and thus proximately causes the incapacity, the relative contributions of the accident and the pre-existing condition will not be weighed. Wilder v. Barbour Boat Works,84 N.C. App. 188, 196, 352 S.E.2d 690, 694 (1987).
5. Subsequent to Plaintiff's compensable injury by accident, Defendant placed Plaintiff in a "make work" job that he could not have obtained in the normal competitive job market. The fact that Plaintiff is capable of performing employment tendered by Defendant is not, as a matter of law, an indication of Plaintiff's ability to earn wages. In this case, Plaintiff's "make work" job does not prove that he has the ability to earn wages. Plaintiff's current inability to earn wages is due to his disability, and not economic conditions. N.C. Gen. Stat. § 97-2(9) (2007). Saums v. Raleigh Cmty. Hosp., 346 N.C. 760, 764, 487 S.E.2d 746,750 (1997); Peoples *Page 20 v. Cone Mills Corp., 316 N.C. 426, 428, 342 S.E.2d 798, 806 (1986);Montgomery v. Toastmasters, Inc., 174 N.C. App. 320, 325-326,620 S.E.2d 685, 690 (2005).
6. Plaintiff is temporarily, totally disabled as a result of his injuries, which limit him to light or sedentary work. Due to his inability to find employment, his age, his inexperience with office work, his lack of transferable job skills, and his considerable physical work restrictions, he is currently totally disabled from working, and further efforts to seek employment would be futile. Thus, the fact that Plaintiff can do sedentary work does not preclude a finding of total disability. N.C. Gen. Stat. § 97-29 (2007). Peoples v. Cones MillsCorp., 316 N.C. 426, 342 S.E.2d 798 (1986); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454, (2003).
7. Plaintiff is entitled to temporary total disability benefits from June 26, 2006, the date that Defendant laid him off from his "make work" job, and continuing until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29 (2007).
8. Plaintiff is entitled to have the Defendant pay for all past and future medical expenses, incurred or to be incurred as a result of treatment for the Plaintiff's work injury to his left shoulder, for so long as such treatment is reasonably required to provide relief, effect a cure, or lessen Plaintiff's period of disability. N.C. Gen. Stat. § 97-25 (2007).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay past due temporary total disability benefits in the amount of $665.87 per week from June 26, 2006 and continuing until further Order from the Industrial *Page 21 
Commission. All benefits past due shall be paid by Defendant to Plaintiff in a lump sum subject to the attorney's fees, discussed below.
2. Defendant shall pay for all past and future medical expenses incurred or to be incurred by Plaintiff's as a result of the compensable injury to his left shoulder, for so long as such treatment is reasonably required to provide relief, to effect a cure, or to lessen Plaintiff's period of disability, according to procedures adopted by the Commission. N.C Gen. Stat. § 97-25 (2007).
3. A reasonable attorney's fee of 25 percent of the compensation due Plaintiff is hereby approved for Plaintiff's counsel, payable as follows: twenty-five percent of the lump sum due Plaintiff shall be deducted from that sum and paid directly to Plaintiff's counsel, thereafter Plaintiff's counsel shall receive every fourth check.
4. Defendants shall pay the costs of this action.
This the ___ day of July 2008.
 S/_______________
 BERNADINE S. BALLANCE
 COMMISSIONER
CONCURRING:
 S/_______________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 DISSENTING: *Page 22 
 S/_______________ DIANNE C. SELLERS COMMISSIONER *Page 23